UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| TUSK ENERGY SERVICES, LLC, <u>et</u> <u>al.</u>,[1] | ) | Case No. 16-51082 |
| | ) | |
| Debtors. | ) | Joint Administration Pending |
| | ) | |

**DECLARATION OF KENNETH MYERS IN SUPPORT OF CHAPTER 11 PETITIONS
AND FIRST DAY PLEADINGS**

Kenneth Myers, being duly sworn, deposes and says:

1. On February 18, 2016 (the "<u>Petition Date</u>"), Tusk Energy Services, LLC, Tusk Subsea Services, LLC, Tusk Construction, LLC, and Rene Cross Construction, Inc. (collectively, the "<u>Debtors</u>") as debtors and debtors in possession in the above-captioned cases, each commenced a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, <u>et seq.</u> (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Western District of Louisiana (the "<u>Court</u>").

2. I have been the President of Tusk Energy Services, LLC since its inception. In this role, I have become thoroughly familiar with the day-to-day operations and the business and financial affairs of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Tusk Energy Services, LLC (8903); Tusk Subsea Services, LLC (9064); Tusk Construction, LLC (9752), and Rene Cross Construction, Inc. (7838) The location of the Debtors' corporate headquarters and service address is: 211 Thru-way Park Rd., Broussard, LA 70518.

1

NO:0105949/00001:185140v2

16-51082 - #14  File 08/08/16  Enter 08/08/16 17:32:51  Main Document  Pg 1 of 14

3. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1109 of the Bankruptcy Code.

4. I submit this Declaration (the "Declaration") to assist the Court and the other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of the first day motions and applications filed in these cases (the "First Day Motions"). Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information provided to me by certain of the Debtors' employees, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the operations and financial affairs of the Debtors. If I were called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration.

5. This Declaration is divided into two sections. Section I provides a brief description of the Debtors' current organizational structure and operations, their current financial condition and the events giving rise to these cases. Section II sets forth those facts that are most germane to this Court's determination of the Debtors' various motions for first day relief and is intended to supplement any other declarations or affidavits submitted in direct support of such motions.

NO:0105949/00001:185140v2

# I.
# BACKGROUND AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

**A.  Corporate Structure**

6.  Tusk Energy Services, LLC is the corporate parent of the other three debtors, owning 100% of the equity interests of each.

**B.  Overview of Business Operations.**

7.  The Debtors have essentially two operating businesses: (i) a dredging and jetting services company, operating under the name of Tusk Subsea and operating through assets of Debtor Tusk Subsea Services, LLC ("Tusk Subsea"); and (ii) an inland marine construction business, operating under the name of Rene Cross Construction and operating through assets of Debtor Rene Cross Construction, Inc. ("Rene Cross Construction").

**C.  Prepetition Capital Structure**

8.  The Debtors' secured lender is Origin Bank ("Origin Bank").  The Debtors are indebted to Origin Bank, as of the Petition Date, in the amount of approximately $5,002,572.47 in principal, plus accrued interest, pursuant to a secured credit facility ("Secured Credit Facility").  Origin Bank has security interests ("Pre-Petition Lender Liens") in substantially all of the Debtors' pre-petition equipment, receivables, and other assets (the "Pre-Petition Collateral").

9.  The Debtors are currently in default under the Secured Credit Facility due to an inability to make required payments of principal and interest.

**D.  Events Leading To A Chapter 11 Filing**

10.  Prior to the Petition Date, the Debtors suffered from the effects of the overall severe slowdown in offshore oil and gas exploration and production activity in Louisiana and in other areas where the Debtors conduct business.  The decline in the price of crude oil that began

3

NO:0105949/00001:185140v2

16-51082 - #14  File 08/08/16  Enter 08/08/16 17:32:51  Main Document  Pg 3 of 14

in mid-2014 and extending into 2016 has severely impacted exploration and production activities and demand for many of the Debtors' services.

11. Prior to the Petition Date, the Debtors reviewed their strategic options and determined that, in order to maximize the value of their businesses and assets for the benefit of creditors and their estates, the Debtors either (i) required additional liquidity, in the form of refinancing, additional loans, or additional equity contributions; or (ii) should pursue marketing and potential sale of the Debtors' businesses. In the period before the Petition Date, the Debtors pursued various options for additional liquidity, unfortunately without success. The Debtors also solicited expressions of interest from interested parties to purchase the business and assets of the Debtors, and two parties presented the Debtors with letters of intent in July, 2016.

12. Prior to the Petition Date, the Debtors experienced a liquidity crisis by which they required sufficient funding to continue to operate their businesses. Just prior to the Petition Date, the Debtors received certain short-term advances ("Pre-Petition Advances") from the Debtors' prepetition secured lender, Origin Bank. As of the Petition Date, the Debtors require additional post-petition advances and use of Origin Bank's cash collateral in order to continue operating the Debtors' businesses.

13. The Debtors anticipate that they will market their businesses and assets for sale during their chapter 11 cases, by working with the parties who have already expressed interest and soliciting further interest, with the goal of maximizing the value of the businesses and assets for the benefit of the creditors and the estates.

# II.
# FIRST DAY PLEADINGS

14. Concurrently with the filing of this Declarations, the Debtors will be filing a number of first day motions. The Debtors anticipate that the Court will conduct a hearing soon after the commencement of the Debtors' chapter 11 cases (the "First Day Hearing"), at which time the Court will hear the First Day Motions. For those motions being heard at the First Day Hearing, the relief requested therein is necessary and appropriate under the circumstances as the Debtors will suffer irreparable harm if any of the relief requested is not granted.

15. Generally, the First Day Motions have been designed to meet the goals of: (a) continuing the Debtors' operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of the Debtors' suppliers, employees, and certain other key constituencies; and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First Day Motions is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization. I also believe that the matters addressed in the First Day Motions are of a genuinely emergent nature, and that the relief requested in the First Day Motions is required to preserve the assets of the Debtors' estates and to maintain the Debtors' ongoing business operations. Moreover, I believe, as further described below, that the failure to immediately address the issues set forth in the First Day Motions will have extremely adverse effects on the Debtors, their estates, and their creditors.

### A. Motion For Interim And Final Orders (1) Authorizing And Approving Emergency Post-Petition Financing; And (2) Providing Superpriority Administrative Expense Status ("<u>DIP Loan Motion</u>")

16. Pursuant to Section 364(c) of the Bankruptcy Code, the Debtors request that the Court authorize the DIP Loan as defined in the DIP Loan Motion to provide for post-petition funding to provide for payroll, insurance, and other operating expenses.

17. The Debtors request authority to enter into the DIP Loan on an interim basis (and subject to a final hearing, on a final basis), by which Origin Bank, as DIP lender, will provide a postpetition loan to the Debtors up to a total amount of $500,000, provided, however, that the Debtors shall use the proceeds of the DIP Loan solely in compliance with the interim budget attached to the DIP Loan Motion (the "<u>Interim Budget</u>"). Prior to the final hearing in this matter, the Debtors shall submit the final form of budget for the entire term of the DIP Loan ("<u>Final Budget</u>").

18. In addition to the request to enter into the DIP Loan, the Debtors have requested the use of cash collateral (as defined in section 363(a) of the Bankruptcy Code) constituting proceeds of accounts and revenues from operations of the Debtors' businesses in connection with the Chapter 11 Case (the "<u>Cash Collateral</u>"). Origin Bank, as the Debtors's pre-petition lender with security interests in substantially all of the Debtors' assets, does not consent to the use of its Cash Collateral, except upon the express terms of the interim order and final order on the DIP Loan Motion. Without the use of Cash Collateral, it would disrupt the Debtors as a going concern, the value of the underlying assets would significantly decline, and would not be in the best interest of the Debtors, their estate, or their creditors.

19. The Debtors have determined that they are unable to obtain secured credit from sources other than Origin Bank that would be allowable under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code for the purposes set forth in the interim order. Further, Origin

Bank would not consent to any priming liens except as set forth in the interim order, asserting that the Debtors could not have provided adequate protection for any such proposed financing.

20. Origin Bank has agreed to provide the requested DIP Loan and use of Cash Collateral in accordance with the terms contained in the interim order and final order submitted with the DIP Loan Motion, including in the amounts, categories and times set forth in the Interim Budget, which shall be used on an interim basis (and if approved in a final order, on a final basis under the Final Budget) for: (i) operational expenses of the Debtors and their businesses; and (ii) other costs and expenses of administration of these Chapter 11 cases.

21. Without the DIP Loan and use of Cash Collateral, the Debtors will be unable to pay its necessary payroll and other operating expenses, and operate the Debtors' businesses as a going concern in a manner that will avoid irreparable harm to the Debtors' estates.

22. Origin Bank has indicated its willingness to provide the DIP Loan and allow the use of Cash Collateral, subject to the terms and conditions set forth in the nterim order and final order submitted with the DIP Loan Motion. Origin Bank's lending of the DIP Loan is conditioned upon the grant of postpetition liens that will constitute a first priority lien in all postpetition assets of the Debtors (including without limitation receivables), subject only to the Carve-Out (as defined in the DIP Loan Motion).

23. The terms of the DIP Loan and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and Origin Bank. The terms of the DIP Loan are at least as favorable to the Debtors as those available from alternative sources, under all of the circumstances. Given the current market conditions and under the particular circumstances of theses Chapter 11 cases, there are no other sources of funding. Given the exigencies of the case, the Debtors believe the DIP Loan is the best and only option.

7

B. **Motion For Entry Of Interim And Final Orders (I) Authorizing Payment Of Wages And Employee Benefits; And (II) Directing Financial Institutions To Honor And Process Checks And Transfers Related To Such Obligations ("Wages Motion")**

24. In the ordinary course of its business, the Debtors incur payroll and various other obligations and provide other benefits to its employees for the performance of services. As of the Petition Date, Debtors employed a number of employees, including both full time and part time employees, with some employees salaried and others paid on an hourly basis (collectively, the "Employees").

25. The Debtors have costs and obligations with respect to the Employees relating to the period prior to the Petition Date. Certain of these costs and obligations are outstanding and due and payable, while others will become due and payable in the ordinary course of the Debtors' business after the Petition Date.

26. Prior to the Petition Date and in the ordinary course of business, the Debtors typically paid obligations relating to wages, salary and compensation for the Employees (collectively, the "Wage Obligations") through direct deposits into Employees' accounts on a weekly basis for Rene Cross Construction and bi-weekly for Tusk Subsea Services. The Debtors' current estimated monthly gross payroll (including tax and other withholding) is approximately $100,000. Following the Debtors' customary payroll schedule, the next payroll is due to be paid on August 12, 2016. The Debtors will pay such postpetition Wage Obligations.

27. The Debtors issued paychecks to certain Employees on August 5, 2016. However, the Debtors believe that not all such paychecks have been cashed yet, and seek permission to direct the Bank (as defined herein) to honor such paychecks.

8

NO:0105949/00001:185140v2

28. The Debtors seek to be authorized, but not required, to pay any outstanding Wage Obligations due and owing up to $100,000, and to pay all Wage Obligations that arise post-petition in the ordinary course of business.

29. The Employees and management incur various expenses (collectively, the "Reimbursable Expenses") in the discharge of their ordinary duties. Specifically, the Debtors reimburse for a variety of business expenses, including without limitation, travel expenses and general expenses incurred for the Debtors' benefit. Because these expenses are incurred as part of their official duties and in furtherance of the Debtors' business, the Employees and managers are reimbursed in full after submission of appropriate documentations to the Debtors' accounting department and with appropriate approvals. Expenses are reimbursed on a rolling basis.

30. Although it is difficult for the Debtors to determine the amount of Reimbursable Expenses outstanding at any particular time, the Debtors estimate that no amounts in Reimbursable Expenses remain outstanding as of the Petition Date.

31. The Reimbursable Expenses were all incurred as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed. Accordingly, to avoid financial harm to Employees who incurred Reimbursable Expenses, the Debtors request authority, to be exercised in their sole discretion, to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, and (b) pay all Reimbursable Expenses due and owing (including those that accrued prepetition), or that may become due and owing, to Employees and managers.

32. The Debtors are required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing

authorities (collectively, the "Taxing Authorities"). In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes"). The Debtors request the authority to pay these Payroll Taxes in the ordinary course of business.

33. The Debtors remit most of the Payroll Taxes to the Taxing Authorities on a quarterly basis. The Debtors seek authority to pay any and all prepetition, outstanding Payroll Taxes in the ordinary course of business.

34. In the ordinary course of business, the Debtors have established various benefit plans and policies for their Employees (collectively, the "Employee Benefits") including health insurance (collectively, the "Health and Welfare Plans").

35. The Debtors offer a health insurance policies for their employees in the total premium amount of $18,775.00 per month. The Debtors also provide Employee Benefits through Dearborn Life in the amount of $100.00 per month.

36. Full-time Employees are eligible, in certain circumstances, to receive their full wages for, among other things, vacation time ("PTO"). The Employees earn their annual PTO days based on their length of service. Generally, this amount is not a current cash payment obligation as to Employees and as such, most Employees will receive their vacation time as paid time off in the ordinary course of business (and not as a cash payment). The Debtors seek approval to pay such amounts in the ordinary course of business.

37. The Debtors also administer other PTO programs for holidays and bereavement. The Debtors are not aware of any accrued and unpaid obligations relating to these programs, which allow Employees to take paid days away from work, but do not entitle the Employees to any payments for earned and unused PTO.

38. The Debtors are required to maintain for its Employees workers' compensation coverage for claims arising from or related to their employment with the Debtor (the "Workers' Compensation Program").

39. Pursuant to the Workers' Compensation Program, the Debtors approximately $3,000 per month in premiums, and seek authority to, in their discretion, continue to pay such Workers' Compensation Premiums. Further, the Debtors seek to be authorized, but not be required to continue to pay the Workers' Compensation Premiums that accrue subsequent to the Petition Date in the ordinary course of business.

40. Under the Debtors' calculations, none of the Debtors' Employees have prepetition claims for payment, after accounting for all Employee Obligations, in excess of the $12,475 cap.

41. For the reasons set forth herein, in these cases, any delay or failure to pay the Employee Obligations would irreparably impair the Employees' morale, dedication, confidence, and cooperation. Any such delay or failure would further adversely impact the Debtors' relationship with its Employees at a time when the Employees' support is critical to the Debtors' strategic vision for this chapter 11 case. At this stage, the Debtors simply cannot risk the substantial damage to the value of its business that would inevitably result if the payments described herein are not made to, or on behalf of, its Employees.

42. In addition, absent an order granting the relief requested herein, the Employees will suffer hardship as the amounts in question are needed, for example, to enable the Employees

11
NO:0105949/00001:185140v2

16-51082 - #14  File 08/08/16  Enter 08/08/16 17:32:51  Main Document  Pg 11 of 14

to be covered for workers' compensation. Similarly, without the requested relief, the stability of the Debtors will be undermined, perhaps irreparably, by the distinct possibility that otherwise loyal Employees will seek other employment alternatives.

43. The Debtors do not seek to alter their Employees' compensation, vacation or other benefit policies through this Motion. This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving the Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their sole discretion, to continue to honor certain of its practices, programs, and policies with respect to its Employees as they were in effect as of the Petition Date.

44. Payment of the Employee Obligations is critical to these chapter 11 cases. A significant deterioration in employee morale at this critical time undoubtedly would have a devastating impact on the Debtors and the value of the Debtors' assets and business. The total amount sought to be paid herein is relatively modest compared with the size of the Debtors' overall business and the importance of the Employees to the Debtors' chapter 11 cases. Accordingly, payment of all of the Employee Obligations in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all parties in interest.

**C.  Debtors' Motion For An Order Granting Extension Of Time For Filing Schedules And Statements Of Financial Affairs ("<u>Schedules Motion</u>")**

45. The Debtors have a significant number of separate creditors about whom they must develop pertinent information, including names, addresses, claim amounts and applicable security for those claims. Additionally, in order to properly complete their schedules of assets and liabilities and statements of financial affairs ("<u>Schedules and SOFAs</u>") the Debtors must

prepare, among other items, lists of assets, lists of payments made to creditors, lists of payments made to insiders, and lists of executory contracts and unexpired leases and the counterparties to those contracts and leases. Completing the Schedules and SOFAs for each of the Debtors will require the collection, review and assembly of a considerable amount of information held in a number of locations involving numerous contractors and subcontractors.

46. The Debtors recognize the importance of assembling this information and intend to complete the Lists and Schedules and SOFAs as quickly as possible under the circumstances. However, given the urgency with which the Debtors have sought chapter 11 relief and other matters that the Debtors' limited staff must address in the early days of these cases, the Debtors will not be in a position to complete the Schedules and SOFAs by August 22, 2016.

47. Accordingly, the Debtors respectfully request that the Court extend by approximately thirty (30) days, through and including September 15, 2016, the date by which the Schedules and SOFAs must be filed.

[SIGNATURE APPEARS ON NEXT PAGE]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on August 8, 2016

By: _____
Name: Kenneth Myers
Title: President, Tusk Energy Services, LLC and Authorized Representative for Tusk Subsea Services, LLC, Tusk Construction, LLC, and Rene Cross Construction, Inc.